### UNITED STATES v. QUIMBY.
### No. 436.

Circuit Court of Appeals, Second Circuit.
July 7, 1931.

SWAN, Circuit Judge, dissenting.

Brodek, Raphael & Eisner, of New York City (Eugene J. Raphael, Louis P. Eisner, Ralph H. Raphael, and Charles A. Brodek, all of New York City, of counsel), for appellant.

George Z. Medalie, U. S. Atty., of New York City (William B. Herlands, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, SWAN, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The appellant was convicted on eleven counts of an indictment, containing twelve counts, charging use of the mails in furtherance of a scheme to defraud. The tenth count was dismissed at the trial, and his codefendant Cutler was acquitted on all counts.

Clarke Bros., a private banking institution, carried on business for 88 years, but closed its doors June 29, 1929, when bankruptcy followed. The fraudulent scheme charged was that the appellant and one Cutler, together with James R. Clarke, William H. Clarke, and Philip Clarke, unlawfully and fraudulently devised and intended to devise a scheme to defraud certain named depositors and others unnamed, "as depositors and lenders." The scheme is charged to have existed from April, 1927, to June 29, 1929. Clarke Bros. were private bankers and lawfully held themselves out as such. They accepted deposits of moneys offering interest at 5½ per cent. on special accounts, and 3 per cent. on ordinary accounts. The appellant and his codefendant are charged with taking sums of money placed on deposit, as loans without sufficient security. The theory of the indictment is that such lending of money was part of the scheme to defraud and was made with the knowledge of Clarke Bros., and used not only to enrich the appellant, but also one of the Clarkes. In this way it is said that money was fraudulently obtained from depositors.

Appellant was not an officer of the bank nor in its employ. It is further claimed that accounts were solicited and deposits obtained so that money might be borrowed by the appellant, and that representations were made that Clarke Bros. were conducting a sound conservative business, under the supervision of the New York state banking department, and that Clarke Bros. were solvent. It is claimed that the representations were false and untrue; that Clarke Bros. were not doing a legitimate business, and were not financially sound, nor was it a staple and reliable banking house, and that it did not conduct its business in accordance with the principles of sound banking and disregarded the banking laws of the state of New York. Private banks of this kind are not under the supervision of the banking department under the law of New York.

The first count, after charging the alleged scheme to defraud, says that Clarke Bros. placed in the post office on June 29, 1929, a printed circular and calendar addressed to one McGovern, soliciting deposits from the addressee; count 2, a letter of May 29, 1928; count 3, on June 25, 1928; count 4, September 28, 1928; count 5, January 13, 1927; count 6, June 30, 1927; count 7, May 29, 1928; count 8, November 26, 1928; count 9, March 16, 1929; count 11, December 31, 1928; count 12, June 28, 1929. These letters inclosed a blotter or calendar used for advertising purposes and suggested the service of Clarke Bros. as bankers, or offered their services to persons wishing to travel by way of selling travelers' checks.

There was no direct proof of an agreement or scheme to defraud; the jury were asked to infer it from the circumstances. Appellant was shown to have been a depositor and a borrower of money from the bank. He frequented the bank often in the years preceding its failure, as often as once or twice a week. He was seen sometimes lunching with members of the firm. The loans made to the appellant were at various times during the two years preceding the failure, and on the closing of the bank amounted to $185,000. He gave his note each time to James R. Clarke. The notes were not entered on the books of the bank until September 18, 1928, when James R. Clarke instructed the note teller to make entries in the discount ledger under appellant's name. As collateral for these notes, appellant gave a claim for commissions against the New York Edison Company for $750,000, and from that time on moneys were loaned against the security. Of the $185,000, $55,000 was represented by notes made by the appellant to James R. Clarke, which he gave Clarke for his personal accommodation so he could discount them at some other bank. About $40,000 of this sum was used by Clarke to build a home for his daughter. Appellant was never asked to pay this $55,000, and he assumed Clarke would take care of these obligations. The validity of the claim given as collateral security was severely questioned at the trial. Three eminent members of the bar testified to its legality, and it might well have been reasonable for Clarke Bros. to accept it as collateral. From time to time subsequent to the assignment to the bank appellant made several assignments of interest therein to others, amounting in all to about one-third of the amount of the claim.

The appellee was permitted to prove some judgments recovered against the appellant by third parties.

Years before the failure of the bank, James R. Clarke advanced $150,000 to the Port Terminal Corporation, a corporation which appellant had promoted, and held its note for that amount. This company had an enterprise in New Jersey, but it was a failure. It was shown to have been carried on the books of the bank at $840,000. Appellant disclaimed any knowledge of the book entries of the bank. The appellant was interrogated in a preliminary examination before a commissioner, and he was asked by the United States attorney to explain why Clarke Bros. carried this loan at $840,000, to which he replied that he knew nothing of the book entries and knew no reason therefor. But in this fraud charge it is argued that this amounted to proof of some improper entry made in the Clarke Bros. books and therefore was fraudulent. An interest in a McCarter Syndicate was carried on the books of the bank at $700,000, and the appellant was interrogated before the commissioner as to whether he knew that fact. He disclaimed knowledge thereof. No proof was offered at the trial below to show such an entry was made on the books of the bank or that appellant knew thereof. But the argument proceeded that this was another transaction to defraud the creditors. Indeed, no proof was offered that the books of the bank carried either of these items, and the United States attorney argued as if they had been proven. The deposition before the commissioner was received in evidence.

It is further said that there was a scheme to defraud lenders of money. In June, 1929, Clarke Bros. were endeavoring to obtain a loan from two banks in the city of New York, and offered as collateral very questionable security. The appellant made affidavits making false statements as to this proposed collateral. One was an alleged interest in some oil property rights at Magdalena Bay, Southern California, given as collateral for appellant's demand note of $500,000. The property was said to be worth $25,000,000, and was controlled by one Heney, and such statement was made in an affidavit by Heney. James R. Clarke used this in an effort to obtain a loan of $500,000. Appellant said that he had obtained for Heney a contract for the oil rights in this property to the Merrill-Sinclair Syndicate, and that Heney had already been paid $500,000, and that a balance of $4,500,000 was to be paid in August, 1929, and that appellant would be entitled to a commission of $500,000 at that time. This was established to be false. In the McCar-

ter Syndicate referred to, appellant made an affidavit, June 14, 1929, representing that he had performed services there which entitled him to $6,850,000 in cash, and stated that he had assigned one-half of this sum to James R. Clarke. It was established that he had no interest. His affidavit, relating to the so-called Merrill-Sinclair Syndicate, involved oil-producing lands in Venezuela and other South American countries, and said that in the distribution of the profits, which would take place in sixty days, there would be paid $17,000,000 for services rendered. This was false. The so-called Merrill-Sinclair Syndicate did not exist. He made still another affidavit as to a claim against the republic of Georgia in which it was stated that he would receive $25,000,000 for services rendered there. These affidavits were used by Clarke Bros. in an endeavor to borrow money from the banks. No money was loaned by either or any bank. For making such false affidavits, there is ample criminal punishment.

Appellant never mailed or caused to be mailed any of the calendars or circulars, the subjects of the counts on which he has been convicted. Clarke Bros. mailed them as part of their business in accordance with a custom in use for years. They made known to the appellant the financial embarrassment of the bank, and asked for this, his alleged collateral, as security for a prospective loan they wanted to negotiate. But the letters which were mailed did not bear on these loans; they inclosed either a blotter or monthly calendar. They were letters notifying depositors that interest had been credited; a letter urging the purchase of traveler's checks for use on foreign journeys; a letter recommending the rental of safe deposit vaults; a letter recommending an investment; letters calling attention to the maturity date of Liberty bonds of the third series; a letter inquiring about the responsibility of a new depositor who had given the addressee's name as reference; and a letter suggesting that, if the depositor was pleased with Clarke Bros.' service, he recommend the bank to others. From all that appears, such letters, as an advertising plan, might have and had been customarily used over a long period of the 88 years of the bank's existence.

The case was submitted to the jury on the theory that there was a scheme to defraud both depositors and lenders of the bank—one enterprise. There was no use of the mails.

made in any endeavor to defraud institutions into loaning money to the bank. The use of the affidavits was of no effect, and the claimed use of the mail to defraud lenders may be eliminated. The mail was used in respect to depositors only. The letters, blotters, and calendars which were sent through the mail were not unusual, nor did they make known any scheme or plan which was fraudulent. There was no scheme of the appellant with the Clarkes to defraud depositors and lenders wherein the mail was used in its furtherance. No effort was made to borrow money from any financial institutions until June, 1929, which was long after the use of the mails as set forth in the counts of the indictment, except the calendar which was marked and mailed and is the subject of the twelfth count. The use of the mails, in execution of the fraudulent scheme, is the gist of the offense for which the appellant was indicted. Olsen v. U. S. (C. C. A.) 287 F. 85.

The government has proved that appellant was a borrower when the bank failed in June, 1929, and the bank had his notes for $185,000, which were payable to the order of James R. Clarke and indorsed by him, that $130,000 of these notes represented loans made by James R. Clarke, and that the balance were accommodation notes by the appellant to Clarke, and that there was collateral for these notes; there had been pledged a claim of $750,000. The circumstances of the borrowing of these moneys and the acceptance of the securities may give rise to a charge of crime under the state law, but we cannot find from the proof that there was any evidence of a fraudulent use of the mails with which the appellant is in any way connected. The letters were sent to depositors or prospective depositors of the bank in furtherance of the Clarke Bros. business. One of the objects of the firm's business was to secure depositors, and advertising, such as sending blotters and calendars with a request to purchase travelers' checks, cannot be said to be a fraudulent scheme. The firm, while in existence, might endeavor to secure depositors. This record shows appellant to have been a customer of the bank, good or bad, but it does not establish directly or circumstantially his use of the mails in a scheme to defraud. Salinger v. U. S. (C. C. A.) 23 F.(2d) 48.

There was no evidence to indicate that the appellant had reason to believe that his borrowing on notes which he gave to Clarke and which Clarke indorsed and discounted at the bank would cause any loss to depositors. Clarke Bros. was a partnership, and partners could not have been engaged individually in defrauding themselves; of course they could defraud depositors, but it has not been established that they had a plan or scheme to defraud their depositors. The lessening of the financial ability to meet the claims of its depositors may have been very wrong, but there is no fraudulent use of the mails in furtherance of a scheme to defraud. If there was unlawful use made of the funds of the bank by the Clarke Bros., that was a subject of some other crime, possible of prosecution in the state courts.

Indeed, the record does not disclose the financial position of the bank on the day it was closed, and, on the proof here, the court should have directed a verdict of acquittal of the charged crime.

Judgment reversed.

SWAN, Circuit Judge, dissenting.